# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-1275V

| | |
|---|---|
| ELAINE LAMBERT,<br><br>                     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                     Respondent. | Chief Special Master Corcoran<br><br>Filed: March 10, 2025<br><br>CORRECTED |

*Heather Varney Menezes*, Shaheen & Gordon, P.A., Manchester, NH, for Petitioner.

*Emily Hanson*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On April 22, 2021, Elaine Lambert filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA"), as defined in the Vaccine Injury Table, after receiving an influenza ("flu") vaccine on October 31, 2020. Petition at 1, ¶ 3.

For the reasons described below, and after briefing by the parties, I find that Petitioner is entitled compensation, and I award damages in the amount of **$82,031.61**, **representing $80,000.00 for actual pain and suffering, plus $2,031.61 for past unreimbursed expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Relevant Procedural History

Along with the Petition, Ms. Lambert filed an affidavit and some of the medical records required by the Vaccine Act. Exs. 1-6, filed Apr. 22, 2021, ECF No 1; *see* Section 11(c). A few weeks later, she filed the remaining medical records. Exs. 7-8, filed May 3, 2021, ECF No. 7. On October 19, 2021, the case was activated and assigned to the "special processing unit," or "SPU" (OSM's adjudicatory system for resolving cases deemed likely to settle). ECF No. 9.

Over the subsequent eight months, Petitioner filed additional situs evidence and updated orthopedic and physical therapy ("PT") records – all needed to address the issue of severity. Exs. 9-13, ECF Nos.16, 18, 21; *see* Section 11(c)(3)(D)(1)(i) (the Vaccine Act's six-months severity requirement). The parties attempted for nine months to reach an informal settlement, but reached an impasse by September 2023, and proposed instead filing briefing regarding the issues of entitlement and damages. Status Report, ECF No. 36.

On November 2, 2023, Petitioner filed her motion, seeking $80,000.00 for actual pain and suffering and $2,031.61 to reimburse her out-of-pocket expenses. Petitioner's Motion for a Ruling on the Record as to Entitlement and Damages ("Brief") at 1, ECF No. 37. Respondent reacted on December 18, 2023, arguing that I should deny entitlement because Petitioner had failed to establish that she suffered the sequelae of her alleged SIRVA for more than six months. Respondent's Response to Petitioner's Motion ("Opp.") at 6-9, 16, ECF No. 38. Regarding damages, Respondent agrees that Petitioner would be entitled to the $2,031.61 in past unreimbursed expenses (*id.* at 9), but proposes a pain and suffering amount less than $40,000.00 (*id.* at 16). In her reply, Petitioner counters the arguments made by Respondent. Petitioner's Reply to Opp. ("Reply"), filed December 22, 2023, ECF No. 39.

## II. Finding of Fact Regarding Duration

At issue is whether Petitioner continued to suffer the residual effects of SIRVA for more than six months. Section 11(c)(1)(D)(i) (statutory six-month severity requirement).

### A. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation,

2

and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). "The medical records made at the time treatment was sought or provided are far more reliable than the witnesses' testimony, five years later, to the contrary." *Id.* at *20.

However, this rule does not always apply. The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.,* 23 Cl. Ct. 726, 733 (1991) (quoting with approval the standard used by the special master below), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir. 1992). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Court of Federal Claims has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

A special master is obligated to fully consider and compare the medical records, testimony, and all other relevant and reliable evidence contained in the record. *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to

other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

The requirements of Section 11(c)(1) include a requirement that a petitioner must have suffered the residual effects of the injury for more than six months post-vaccination, must have died as a result of the vaccination, or must have suffered an injury which resulted in inpatient hospitalization and surgical intervention. Section 11(c)(1)(D). As stated by Congress when amending the Vaccine Act in 1987, the six-month severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–373. The only exception to this original rule for vaccine-related injuries not resulting in death is the alternative added in 2000, a showing that the vaccine injury required inpatient hospitalization and surgical intervention. *Children's Health Act of 2000*, Pub. L. No. 106–310, § 1701, 114 Stat. 1101, 1151 (2000) (codified as amended at 42 U.S.C. § 300aa–11(c)(1)(D)(iii)). This exception was added to allow compensation in intussusception cases which often required surgical intervention but then resolved in less than six months. *Id.*

### B.     Factual Finding Regarding Severity

My determination is based on a complete review of the record, including all medical records, declarations, arguments, and additional evidence. Specifically, I highlight the following:

- Prior to vaccination, Petitioner suffered from arthralgia of the left acromioclavicular joint, clavicular enlargement, degenerative changes and osteophytosis in the sternoclavicular joint, and degenerative changes and stenosis from C5-C7 (mild symptoms C4-C5). Ex. 4 at 52-57, 61-74. She also saw a dermatologist for benign skin lesions and tags. *Id.* at 57-60.

- On September 18, 2028, Petitioner sought treatment from her primary care provider ("PCP") for "a tender lump over the left collar bone for about 2 months." Ex. 4 at 71. It was noted that Petitioner suffered from thyroid cancer 1980s, and had three-fourths of her thyroid removed. *Id.* at 65. She was diagnosed with arthralgia of the left acromioclavicular joint, clavicular enlargement, and post-surgical hypothyroidism. *Id.* at 73. Taken two days later, x-rays revealed "degenerative changes in the left sternoclavicular joint

4

- with hypertrophic osteophytosis[3] accounting for the palpable abnormality." *Id.* at 63.

- On January 29, 2019, Petitioner complained of worsening pain over her left clavicular that radiated into her neck, particularly with certain movements, but did not radiate into her arms. Ex. 4 at 54-55. Performed the previous day, cervical x-rays revealed moderate degenerative changes and stenosis at C-5-C6 and C6-C7, and mild degenerative changes at C4-C5. *Id.* at 54. Petitioner was offered, but decline, a CT guided injection. *Id.* at 53.

- At a physical on July 11, 2019, Petitioner had "no particular complaints." Ex. 4 at 47. Thereafter she sought care for unrelated conditions, such as an ache in her lower right leg (*id.* at 37), right heel pain (*id.* at 25), and ongoing skin issues (*id.* at 15).

- On October 31, 2020, Petitioner (age 62) received the flu vaccine alleged as causal intramuscularly in her left deltoid. Ex. 2 at 1; Ex. 11 at 3.

- On November 19, 2020 (19 days post-vaccination), Petitioner sought treatment "for left arm pain that started the day after she got her flu vaccine on 10/31." Ex. 4 at 13. She reported "a lot of pain when the vaccine was given and felt at the time that it may have been administered incorrectly." *Id.* Petitioner described pain in the triceps and posterior deltoid, severe enough to make it difficult to sleep, and decreased range of motion ("ROM"). *Id.* She was referred to physical therapy ("PT"). *Id.* at 14.

- At her initial PT session on November 24, 2020, Petitioner reported pain ranging from one to ten (but at that time ten out of ten). Ex. 6 at 1-2. At her fourth PT session on December 4, 2020, she expressed a concern that "more is wrong." *Id.* at 8. She reported pain at a level on seven out of ten at her next PT session on December 7, 2020. *Id.* at 10. It was reported that "[t]here has been little progress in the pain at this time," but Petitioner did have some improvement in ROM last week which was lost over the weekend. *Id.* at 11.

- At her sixth PT session on December 9, 2020, Petitioner stated that she "[c]ouldn't sleep last night," and was going to see her PCP "right after PT." Ex. 6 at 12.

---

[3] Osteophytosis is "a condition characterized by the by the formation of osteophytes." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1348 (32th ed. 2012). An osteophyte is "a bony excrescence or osseous outgrowth." *Id.*

5

- When seen by her PCP, Petitioner reported terrible pain, noting that she had one good day the week before but a return of symptoms thereafter. Ex. 4 at 11. The PCP ordered x-rays, prescribed Naproxen, and referred her to orthopedist. *Id.* at 12.

- Two days later, on December 11, 2020, Petitioner attended PT (Ex. 6 at 14), and was seen by the orthopedist (Ex. 4 at 8). In the orthopedic records, it is noted that Petitioner was taking Naproxen, but her condition had not improved during 6 PT sessions. Ex. 4 at 8. Her problem was described as "[s]upraspinatus tendonitis [of] left shoulder secondary to flu shot." *Id.* After discussing the possibility of a subacromial steroid injection, the orthopedist stated that Petitioner would continue PT for now. *Id.* at 10.

- Petitioner continued to gain slow improvement, with occasional setbacks and lack of improvement during 15 additional PT sessions in December 2020, through mid-February 2021. Ex. 6 at 16-46. She continued, however, to experience severe pain levels, eight out of ten on January 20, 2021 (*id.* at 26) and seven out of ten on February 17, 2021 (*id.* at 45).

- On March 4, 2021, Petitioner underwent an MRI that yielded findings of mild supraspinatus tendinosis and mild degenerative arthritis of the acromioclavicular joint without active inflammation. Ex. 5 at 2-3.

- On March 16, 2021 (now approximately four and one-half months post-vaccination), Petitioner attended a follow-up appointment with her orthopedist. Ex. 12 at 90-91. This record correctly noted that she was last seen by the orthopedist on December 11, 2020, but mistakenly stated that a steroid injection was administered at that time. *Id.* at 90. Petitioner received her first steroid injection into the subacromial space. *Id.*

- Petitioner was seen twice in April 2021 for heart palpitations. Ex. 12 at 88, 81 (chronologic order). And she had a dermatology appoint in August 2021. *Id.* at 67.

- On November 2, 2021, following a seven-month gap in treatment, Petitioner returned to the orthopedist for follow-up treatment of her left shoulder supraspinatus tendonitis, characterized as chronic. Ex. 12 at 47. Noting that Petitioner had only one steroid injection to date (on March 16, 2021), the orthopedist reported that Petitioner "did well until recently and called requesting [a] repeat injection." *Id.* After discussing the possible treatment

6

- options (including injection), the orthopedist provided Petitioner with a PT referral. *Id.*

- At her initial PT session on November 11, 2021, Petitioner reported some relief from her prior PT, and more significant relief, until recently, from her March steroid injection. Ex. 13 at 5. She described a gradual onset of shoulder pain" during the last month, equating to an early October 2021 symptom reoccurrence. *Id.* Petitioner reported pain ranging from zero to seven out of ten, with a current pain level of seven. *Id.* The therapist opined that Petitioner "presents with signs and symptoms consistent with diagnosis of L[eft] supraspinatus tendonitis." *Id.* at 7.

- Petitioner showed slow but steady progress during eleven additional PT sessions in November 2021, through early-January 2022. Ex. 13 at 9-32. On December 8, 2021, she reported mild to no symptoms, and was able to increase her the free weights she was using. *Id.* at 22. At her last PT session on January 4, 2022, she recounted only "a little pain at the end range of reaching overhead." *Id.* at 31.

- In her third affidavit, executed on April 17, 2023 (Ex. 14 at 3), Petitioner claimed that "[t]he pain in [her] shoulder lessened for approximately two to three weeks after the cortisone injections." *Id.* at ¶ 4. She insisted that "[t]hree years later, [she] still ha[s] discomfort in [her] left shoulder." *Id.* at ¶ 5.

- In his first affidavit, also executed on April 17, 2023 (Ex. 15 at 2), Petitioner's husband described the difficulties Petitioner experienced doing household tasks, falling asleep, and driving and inability "to continue her gym routine." *Id.* at ¶ 5. Regarding the duration of Petitioner's symptoms, he stated only that "[s]ince her vaccination on October 31, 2020, until beginning of 2022, [Petitioner] has been in significant pain as a result of the influenza vaccine she received in her left deltoid." *Id.* at ¶ 2.

To satisfy the Vaccine Act's severity requirement, a petitioner must show that she suffered the residual effects of her SIRVA injury for more than six months. Section 11(c)(1)(D)(i) (severity requirement for cases not involving death or inpatient hospitalization and surgical intervention). Thus, Ms. Lambert must establish that her SIRVA sequelae continued beyond at least May 1, 2021 (assuming an onset date no later than the day after vaccination – which the record preponderantly supports).[4]

---

[4] Although some special masters have interpreted the language of Section 11(c)(1)(D)(i) as requiring sequelae beyond six months of the vaccination date, "I believe a more reasonable interpretation is that,

7

When arguing that Petitioner has failed to meet this requirement, Respondent emphasizes Petitioner's lack of treatment from March 2021 until early-November 2021, more than seven months later. Opp. at 7. He maintains that Petitioner's assertion, as stated in her third affidavit - that the steroid injection she received in March 2021 provided only two to three weeks relief - "is inconsistent with the medical records." *Id.* He also insists that "it cannot be assumed that the shoulder pain reported on or after November 2, 2021, was related to [P]etitioner's flu vaccine on October 31, 2020.: *Id.* at 8.

Petitioner counters that her statement that "[s]he did well until recently" does not equate to a complete symptom resolution during this gap in treatment. Reply at 3-4. Stressing her same diagnosis when returning for treatment in November 2021, her lack of any intervening event (other than her SIRVA) which would account for these later symptoms, and no need for treatment for her left clavicular pain beyond 2019, Petitioner insists that her late November 2021 symptoms are attributable only to her SIRVA. *Id.* at 2-4, 7.

I agree that the contemporaneously-created medical records reflect a greater period of symptom relief than Petitioner contends, whether complete or not. When she returned for treatment in early November 2021, Petitioner clearly described worsening pain beginning in early-October 2021. Ex. 12 at 47; Ex. 13 at 5. This timing equates to a more than six-month period of significant symptom relief.

However, it is not unusual for an individual suffering from a SIRVA injury to obtain at least several months of complete relief from a steroid injection. And Petitioner received such an injection on March 16, 2021. Although she obtained a longer period of relief than many other individuals, I find that it was not so long as to prevent her from establishing six-months sequela. And as Petitioner persuasively argues that her reports of "doing well" did not mean she was completely symptom free. Most importantly, both the orthopedist and therapist who treated Petitioner previously characterized her later symptoms as a continuation of her earlier condition. Ex. 12 at 47; Ex. 13 at 5-7. And the therapist opined that her later symptoms were consistent with her earlier diagnosed supraspinatus tendinosis. Ex 13 at 7.

Of course, the lengthy gap in treatment is highly relevant to damages, as it shows Petitioner had a significant period with little to no pain. But this does *not* mean I cannot

---

since the six-month period measures severity of injury, it cannot begin *before* the time of injury, and hence is properly measured from the date of *onset.*" *Castellanos v. Sec'y of Health & Hum. Servs.,* No. 19-1710V, 2022 WL 1482497, at *2 n.5 (Fed. Cl. Spec. Mstr. Mar. 30, 2022); *But see Herren v. Sec'y of Health & Hum. Servs.,* No. 13-1000V, 2014 WL 3889070, at *2 (Fed. Cl. Spec. Mstr. Feb. 18, 2014) (stating the contrary view – that the six-month period should be calculated from date of vaccination).

8

find the basic requirement of six months severity met. A treatment gap that includes within it the "expiration date" for severity does not automatically mean severity cannot be established.

The Vaccine Act does not require that a petitioner suffer *consistent* symptoms throughout the six-month period post-vaccination, but instead only that a petitioner suffer the residual effects or complications of the alleged injury for *more than six months* after onset. *See* Section 11(c)(1)(D)(i). The overall record in this case shows Petitioner suffered severe pain through March 2021; complete, albeit temporary, relief from six to seven months thereafter; and a return of symptoms that lasted through at least early-January 2022, approximately fourteen months post-vaccination. Accordingly, I find there is preponderant evidence to establish Petitioner suffered the residual effects of her alleged SIRVA for more than six months.

### III. Additional Requirements for Entitlement

#### A. Legal Standards

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury (discussed above in Section II), and the lack of other award or settlement,[5] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Hep B vaccine. 42 C.F. R. § 100.3(a)(VIII)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended

---

[5] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

9

injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

## B. Analysis

Respondent has stated no further objections to compensation, and I find Petitioner has otherwise satisfied all criteria for a Table SIRVA injury following receipt of the flu vaccine. Although Petitioner suffered prior left clavicular and neck pain, there is no evidence of prior left shoulder pain, inflammation, or dysfunction or an alternative cause for Petitioner's symptoms. *See* 42 C.F.R. § 100.3(c)(10)(i), (iv) (first and fourth QAI criteria). And the record supports Petitioner's claim of pain onset within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (second QAI criterion). Petitioner consistently reported left shoulder pain that began immediately or by the next day at the latest. *E.g.,* Ex. 4 at 10 (reporting pain the day after vaccination at first PCP visit); Ex. 6 at 1 (reporting immediate pain at first PT session). Finally, Petitioner exhibited pain and limitations in ROM solely in her left, injured shoulder. *E.g.,* Ex. 4 at 11-13 (orthopedic visit); *see* 42 C.F.R. § 100.3(c)(10)(iii) (third QAI criterion).

As I have determined in this ruling, the record supports a finding that Petitioner suffered the residual effects of her SIRVA for more than six months. *See supra* Section II.B.; *see* Section 11(c)(1)(D)(i) (the Vaccine Act's six-month severity requirement). Additionally, the vaccine record shows Petitioner received the flu vaccine at a CVS Pharmacy in New Hampshire. Ex. 2; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, there is no evidence that Petitioner has collected a civil award for her injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### IV. Compensation to be Awarded

#### A. Legal Standards for Pain and Suffering Awards

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Timberlake v. Sec'y of Health & Hum. Servs.*, No. 20-1905V, 2025 WL 721730, at *1-3 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

#### B. Parties Arguments

The parties agree Petitioner should be awarded $2,031.61 for past unreimbursed expenses. Brief at 1; Opp. at 9. Thus, the only area of disagreement is the amount of compensation which should be awarded for Petitioner's pain and suffering.

Emphasizing the severe pain she experienced during the first five months of her injury, as well as two additional months of symptoms in late 2021, Petitioner maintains

---

[6] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

that she should be awarded $80,000.00 for past pain and suffering. Brief at 17-12, 14. She favorably compares the facts and circumstances in her case to those experienced by the petitioners in *Miller, Bergstrom, Russano,* and *Kent*[7] - decisions featuring this same amount of pain and suffering compensation. Brief at 27-28.

Characterizing Petitioner's SIRVA as mild and limited, Respondent counters that her pain and suffering award should be much lower - $40,000.00. Opp. 10, 14-15. He emphasizes the gaps in treatment – including the aforementioned 2021 gap - and stresses the possibility that some of Petitioner's symptoms and treatment were due to unrelated prior conditions, including left shoulder acromioclavicular arthralgia, sternoclavicular degenerative joint disease, and cervical spine degeneration and stenosis. *Id.* at 12-13. He distinguishes Petitioner's facts and circumstances from those in the cases she cited (*id.* at 13-14), arguing that *Ramos, Villa,* and *Mejias*[8] – involving awards ranging from $40,000.00 to $45,000.00, offer better comparisons.

In her reply, Petitioner disagrees that she experienced the significant pain relief that Respondent claims. She notes that she did not seek treatment for a short time in December 2020 due to illness, and continued to experience symptoms during the gap in treatment following the steroid injection – just not significant enough to warrant treatment. Reply at 6-7. She distinguishes the three cases Respondent cited, emphasizing the delay and milder symptoms in *Ramos,* the significant symptom gap – without preceding steroid injection in *Mejias,* and lack of a detailed decision in *Villa.* Reply at 8-9.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, filings, and all assertions made by the parties

---

[7] *Miller v. Sec'y of Health & Hum. Servs.,* No. 20-0959V, 2023 WL 1749405 (Fed. Cl. Spec. Mstr. June 1. 2023); *Bergstrom v. Sec'y of Health & Hum. Servs.,* No. 19-0784V, 2021 WL 5754968 (Fed. Cl. Spec. Mstr. Nov. 2, 2021); *Russano v. Sec'y of Health & Hum. Servs.,* No. 18-0392V, 2020 WL 3639804 (Fed. Cl. Spec. Mstr. June 4, 2020); *Kent v. Sec'y of Health & Hum. Servs.,* No. 17-0073V, 2019 WL 17849579 (Fed. Cl. Spec. Mstr. Aug. 7, 2019).

[8] *Ramos v. Sec'y of Health & Hum. Servs.,* No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (awarding $40,000.00 for actual pain and suffering); *Villa v. Sec'y of Health & Hum. Servs.,* No. 20-0569V, 2023 WL 4444678 (Fed. Cl. Spec. Mstr. May 26, 2023) (awarding $43,000.00 for actual pain and suffering); *Mejias v. Sec'y of Health & Hum. Servs.,* No. 19-1944V, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 10, 2021) (awarding $45,000.00 for actual pain and suffering).

in written documents. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

The medical records show that Petitioner suffered a SIRVA involving severe pain levels, ranging from seven to ten out of ten, but only mild to moderate limitations in ROM, for almost five months before obtaining significant relief from a steroid injection. During this initial period, she obtained little relief while attending 22 PT sessions in late November through mid-February 2021.[9]

More than six months later, Petitioner experienced symptoms which prompted her to seek further treatment. At an early-November 2021 orthopedic visit, she stated she was doing well until about a month earlier. Ex. 12 at 47. Opting for additional PT, rather than another steroid injection as she additionally requested, Petitioner gained significant improvement within a month.[10] At her last PT session on January 4, 2022, she reported "that she still has a little pain at the end range of reaching overhead. Ex. 13 at 31.

Because they involve petitioner experiencing much milder pain, I do not find the cases cited by Respondent to be particularly good damages award comparables. *Ramos,* 2021 WL 688576, at *2-3, 5; *Mejias* 2021 WL 5895622, at *3-4, 6-7.[11] The *Mejias* and *Villa*[12] petitioners required minimal treatment. *Mejias* 2021 WL 5895622, at *7. And the *Ramos* petitioner delayed almost four months before seeking treatment. *Ramos,* 2021 WL 688576, at *2, 5.

In contrast, the comparable cases cited by Petitioner offer more helpful guidance. All but *Russano* involved petitioners who suffered severe pain levels for approximately five to six months, with an overall injury duration of approximately one year. *Miller*, 2023 WL 1749405, at *2, 5; *Bergstrom*, 2021 WL 5754968, at *5-7; *Kent*, 2019 WL 17849579,

---

[9] Although Petitioner reported slight improvement during three PT sessions in mid-December 2020 (Ex. 6 at 16, 18, 20), she stated she felt worse and then the same in late-December 2020 (*id.* at 22, 24). She did not attend PT again until January 20, 2021, when she stated she had not attended Pt due to illness. *Id.* at 26. In January through February 2021, her worst pain level improved from eight to seven. *Id.* at 26, 45.

[10] By *hr* fifth PT session on November 29, 2021, Petitioner reported "feeling better, able to reach OH without as much sx, still not able to lift OH." Ex. 13 at 17. At her next session on December 4, 2021, she stated that she "[f]eels a little stiff today, but still a lot better than it was." *Id.* at 19.

[11] As Petitioner noted (Reply at 8), I issued an abbreviated damages decision in *Villa* which incorporated my oral ruling made during Expedited Motions Day hearing on May 26, 2023. *Villa*, 2023 WL 4444678, at *1. The *Villa* petitioner suffered only mild pain and limitations in ROM. An Army reservist, she passed a physical the day after vaccination.

[12] As discussed during the Expedited Motions Day Hearing, the only treatment the *Villa* petitioner required was five PT sessions, attended during a seven-month period. *Villa*, 2023 WL 4444678, at *1.

at *11-12. Although the *Russano* petitioner's duration was slightly lower (eight months), she experienced further difficulties that warranted a greater award - her prior breast cancer and lumpectomy which resulted in the inability to fully use her opposing, uninjured arm. *Russano*, 2020 WL 3639804, at *2-3. And all these petitioners required a similar amount of PT and one to two steroid injections. *Miller*, 2023 WL 1749405, at *5; *Bergstrom*, 2021 WL 5754968, at *6; *Russano*, 2020 WL 3639804, at *3; *Kent*, 2019 WL 17849579, at *12. Thus, I find that Petitioner should receive the same past pain and suffering award - $80,000.00.

## Conclusion

For all the reasons discussed above, and based on consideration of the entire record, **I find that Petitioner's left shoulder injury meets the definition for a Table SIRVA. Thus, causation is presumed, and Petitioner is entitled to compensation in this case. Furthermore, I find that $80,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[13] I also find that Petitioner is entitled to $2,031.61 in actual unreimbursable expenses.**

**I therefore award Petitioner a lump sum payment of $82,031.61, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id.*

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.